[No. 3631.]

James Hunnicutt *v.* The State.

1. Evidence — Dying Declarations. — The Code of Criminal Procedure, article 748, prescribes the circumstances under which a dying declaration is admissible in evidence on a criminal trial. With respect to the first condition precedent, the correct rule has been stated as follows: "It is essential to the admissibility of these declarations, and it is a preliminary fact to be proved by the party offering them in evidence, that they were made under

a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction, whether it be proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case; all of which are resorted to in order to ascertain the state of the declarant's mind. . . . If it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actua ly ensued an hour afterwards, the declaration is inadmissible. On the other hand, a belief that he will not recover is not itself sufficient unless there also be the prospect of 'a'most immediate disso'ution.'" See the opinion *in extenso* for facts held sufficient, under the rule, to show the declarant's consciousness of impending death, and to establish the proper predicate for th · admission of his declaration as evidence.

2. SAME.— Interrogatories to a dying person are not prohibited, nor will they invalidate the declarations unless they be of a character calculated to lead the deceased to make the particular statement. See the opinion *in extenso* for interrogatories to a dying person *held* not obnoxious to the rule.

3. SAME — CONSTITUTIONAL LAW.— It is within the power of the Governor to restore the competency of a witness laboring under the disabilities of a felony conviction, even after such person has suffered the penalty assessed against him. See the opinion *in extenso* for a review of the authorities on the question.

4. SAME.— A full pardon, bestowed after a prisoner has served his full term in the penitentiary, has the same effect as would have had a pardon granted him during his term of imprisonment and before its completion; and such a pardon fully restores his competency as a witnes .

5. SAME.— PARDON, to be complete, must, in contemplation of law, be delivered and accepted. The principles applicable to the delivery of a pardon and of an ordinary deed must be considered analogous; and in either case, its delivery is complete when the grantor has parted with his entire control or dominion over the instrument, with the intention that it shall pass to the grantee or obligee, and the latter assents to it either by himself or agent; and the delivery to a stranger may be made effectual, in ordinary cases, by an appropriate expression of the intention with which the delivery is made at the time of the delivery, although no formal words or acts are necessary. The pardon in this case was sent by the Governor to the prosecuting attorney and was by him used as a predicate for the examination of the witness on the previous trial under *habeas corpus*. It was not then repudiated by the witness, but, on the contrary, he exercised his right under it by testifying. *Held*, that the circumstances show a sufficient delivery and acceptance of the pardon.

6. SAME.— Showing that the pardon had been mislaid or lost by the county attorney, and that he had made diligent but unsuccessful search for the same, established a sufficient predicate to admit secondary evidence of its contents.

7. SAME — SECONDARY EVIDENCE.— Article 720 of the Revised Statutes, while it does not, in express terms, require that the Secretary of State shall keep a record book, does require him to keep a fair register of all the official acts of the Governor; which is tantamount to a requirement that he shall keep a record of all such official acts. Such being the case, a certified copy of the charter of pardon, or an exemplification from the register or record

of the Secretary of State, was the proper evidence of the lost document before resort could be had, if at all, to parol testimony, and objection to parol testimony, in the absence of a showing that a certified copy or exemplification could not be had, was well taken.

8. SAME.— A PARDON, in the absence of fraud, will be good though it states the date of the conviction incorrectly, if it was intended to cover and does cover the particular offense. It was only claimed that the pardon in this case misstated the date of the conviction. To support the pardon, the State proved by the records of the court and by the prosecuting officer and by the clerk that, so far as they knew or could ascertain, the witness had been convicted and sentenced to the penitentiary in but one case, which was for the theft of a steer, that being the same offense mentioned in the pardon. The witness was also placed upon his *voir dire* by the court, and, in answer to the court, said that he had been in the penitentiary but once. This proceeding was objected to by the defense upon the ground that, until rehabilitated by a valid pardon, the witness was incompetent for any purpose. *Held*, that the statute in terms provides that "the court may, upon suggestion made, or of its own option, interrogate a person who is offered as a witness, for the purpose of ascertaining whether he is competent to testify;" wherefore the objection was not well taken.

9. CHARGE OF THE COURT — CORROBORATING TESTIMONY — ACCESSORY.— The statute of this State which requires the corroboration of accomplice testimony has always been construed to include principals and accessories. If, therefore, the evidence in a criminal trial tends to show that a State's witness was an accessory to the crime, his corroboration by other testimony becomes necessary in order to warrant a conviction upon his evidence, and omission to so instruct the jury, whether requested or not, is fatal error.

10. SAME — ALIBI.— In the presence of evidence tending to prove an *alibi*, it was the duty of the court to instruct the jury as to the law of that defense; and, its failure so to do being excepted to, the error was fatal.

11. SAME — JUSTIFIABLE HOMICIDE.— The rule is that a person, when attacked, need not resort to other means than killing to protect himself, when the assault by the deceased indicates an intent either to murder, maim or inflict serious bodily injury, but may kill at once and with the most effective means, without resort to other means for the prevention of the injury. In restricting the right of homicide permitted by law solely to the purpose of preventing the offense of murder, the charge of the court was erroneous.

12. SAME — CIRCUMSTANTIAL EVIDENCE.— The law controlling circumstantial evidence should be given in charge only when the State relies solely upon that character of evidence to secure a conviction.

13. PRACTICE — PRIVILEGE OF COUNSEL. —Vituperation and abuse of parties and witnesses, when not warranted by the proof, is a practice which should be promptly suppressed by the trial courts; and counsel should not be permitted to travel outside of the record to discuss facts not in evidence and injurious to the defendant.

14. SAME — JURY LAW.— Article 690 of the Code of Criminal Procedure prohibits any person conversing with a juror after he has been impaneled, and article 692 even prohibits the officer in charge from conversing with the jurors about the case, or with other persons about it in the presence of a juror. To permit the jurors in a criminal cause to have access to newspapers containing imperfect or incorrect accounts of the trial is equally reprehensible, and will vitiate their verdict.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

The appellant was convicted in the first degree for the murder of F. E. Umphress, in Dallas county, Texas, on the 16th day of June, 1884. His punishment was assessed at a life term in the State penitentiary.

John Minton, of Terrell, Kaufman county, Texas, was the first witness introduced by the State. He testified that in June, 1884, he was in the employ of Chris Fisher in Dallas county, Texas. He did not know the deceased. He knew the situation of the "Stock Yard Saloon," which was, he thought, about five miles distant from Chris Fisher's place. On the night of June 16, 1884, the witness was aroused by Chris Fisher, who requested him to go and stay with the defendant. Witness joined the defendant, who asked him to go into the woods and stay with him until day. On the way the defendant, relating the circumstances of a difficulty in which he had been engaged that night, stated, in substance, that he got on his horse and started home that night, but, as he was passing the Stock Yard Saloon, some one stopped him and told him that a man then in the saloon was denouncing him, defendant, as a thieving son-of-a-b—h, and advised him to go in and have the matter settled forthwith; that he then dismounted and went into the saloon as suggested, and gave the man to understand what he, defendant, thought of him, but that no immediate difficulty occurred between himself and the man; that the man who had denounced him went out of the saloon, but soon returned and provoked a disturbance with another party, who "treated" in order to preserve the peace; that the man passed out and returned, quarreling and trying to provoke a difficulty with someone two or three times, directing his efforts at last to the defendant; that the man then had his hand in his pocket, and, being jerked out by some one who called out: "Fight Jim Hunnicutt a fair fight," it disclosed a long knife, with which he rushed at defendant, and that he, defendant, aimed at his breast and stopped him. He added: "When I left, the man was out on the street groaning and taking on, and I expect he is dead by this time." He told the witness that he then got on his horse and went to the house of Chris Fisher, his brother-in-law. The witness had spent the last four months in jail as an attached witness for the State in this case. Witness knew Tom Fisher, who was one of the grand jurors who found this bill of indictment.

Cross-examined, the witness testified that he came to Texas from

North Carolina two years prior to this trial. He went first to the house of William Triplett in Rockwall county. He had known Triplett in North Carolina, prior to his immigration, and was related to him. The witness was charged with horse theft before he left North Carolina, under the following circumstances: He leased some land and other property from his mother for the period of five years, but occupied it but one year and made but one crop. His mother went to a magistrate to institute proceedings to recover possession of one of the horses she had leased him, but failed to give bond for process. The magistrate then had the witness charged with and arrested for the theft of the horse. On the trial the witness asked his mother, when she qualified as a witness, if she had ever sworn that he stole the horse. She replied that she had not. Nevertheless, the justice of the peace fined the witness $1 and costs, which the witness paid and surrendered the horse to his mother. Witness remained in North Carolina two years after this legal experience.

Doctor Schoolfield testified, for the State, that he reached the deceased about one hour before his death, and described the fatal wound. Deceased was in a dying condition when witness reached him, but witness could not say that deceased was or was not aware of that fact. He asked if witness could not do something for him.

R. N. Tooley testified, for the State, that he reached the deceased about three quarters of an hour before his death. As witness went in, the deceased said: "O! my God, Mr. Tooley, I am killed!" Witness asked him what was the matter, and he said that he was shot. Witness then asked him who shot him, and he said "Jim Hunnicutt." Witness then asked deceased where Hunnicutt shot him, and he replied: "He was outside of the saloon and I was inside."

Cross-examined, the witness testified that he was not a witness on the *habeas corpus* trial, though he was then a resident of East Dallas. He was before the grand jury in this case, and made there the same statement he has made on this trial. Mr. Hulbert, the proprietor of the hotel at which the deceased was stopping, was the only man present when witness reached the deceased, but the doctor arrived soon afterwards. Witness thought Hulbert heard what he did, except the first part of the deceased's remarks. Witness did not think that deceased was drinking at the time he saw him.

Otto Glizer was the next witness for the State. He testified that he saw the deceased on the night of his death and after he was shot. Witness heard him several times say, in reply to questions, that the

defendant shot him. Messrs. Maddox, Tooley, Barry and Doctor Schoolfield were with the deceased when the witness arrived.

Policeman Maddox testified that he reached the deceased shortly after he was shot. He heard the doctor ask him who shot him, and he said that the defendant did. The doctor asked him if he was sure, and he answered that he was,— that he saw him as "plain as day." The doctor told the witness, in the presence of the deceased, that the deceased could not long survive the wound.

Cross-examined, the witness said that the reputation of the deceased was that of a quarrelsome, fighting man, though witness could not say that he was regarded as a dangerous man.

The State next introduced Joe Polser as a witness. The defense objected to the competency of this witness, and in support of the objection read in evidence the judgment of the district court of Dallas county, in cause number 3872, entitled *The State of Texas* v. *Joe Polser et al.* (wherein the said Polser was prosecuted for the theft of a steer), overruling the motion for new trial, and sentencing the said Polser to the State penitentiary for the term of two years.

In opposition to the objection urged to the competency of the witness Polser, County Attorney Clint took the stand and testified that after the indictment in this case was presented, he wrote to the Governor of Texas and procured a pardon for Joe Polser; that the proclamation or certificate of pardon was in the usual form, was forwarded to witness, and was used by the witness on the *habeas corpus* trial of this defendant; that he had made diligent search among his own papers for the pardon, and, in connection with the partner of J. C. Kearby, who (said Kearby) assisted in the prosecution under the writ of *habeas corpus*, but who was now absent, he had made diligent search among the papers of the said J. C. Kearby, but had failed to find the said pardon; that he remembered substantially the contents of the said pardon; that the said pardon recited the fact that the said Polser had served out his sentence in the penitentiary, and that the purpose of the said pardon was to restore him to citizenship; that there was a discrepancy between the pardon and the records of the court as to the date of the conviction, the record showing the conviction to have been had in 1878, and the pardon in 1883 or 1884.

District Clerk H. W. Jones testified, for the State, that he had been clerk of the district court of Dallas county since 1876, and since then had been custodian of the records of the said court; that Joe Polser had never been convicted in but one case in the Dallas county district court that he knew of, and that was the case tried in 1878.

Robert B. Seay testified, in substance, the same as did Clint in

reference to the contents of the pardon. He stated also that Polser had served out his term, and that the recital of the date of the conviction of Polser in the pardon was incorrect.

The objection to the competency of Polser being overruled, he was presented and testified, on his *voir dire*, that he had been in the penitentiary but once. Witness was a butcher by trade. Witness was acquainted with the defendant and with Ike Hunnicutt, George Waller, John Herndon and the deceased. They were all present at the Stock Yard saloon on the night that Umphress was shot. Witness went to that saloon on that night to cash a check for seventy-five or eighty dollars which had been given him by one Meyer in satisfaction of a debt. Witness and other parties were shaking dice when the deceased came in and began a difficulty with witness about a steer which he said that Andy Elam and the defendant had stolen from his brother and sold to the witness. Defendant was then present. Witness replied that he did not purchase the steer, and offered to show him the man who did. Deceased then called the witness a d——d liar. Witness presently agreed to treat, in order to keep down a quarrel. Deceased went out of the saloon, but returned and resumed the row, when the witness treated again. Deceased left, and returned, quarreling, the third time, and witness treated again, with the remark that he had treated for peace the last time. Deceased resumed the quarrel, took up a chair and struck the witness, staggering him against the west side-door. Just at this time the defendant, who had gone around to the west side-door, fired and shot the deceased. Deceased ran out of the side door and up the street, making a noise which indicated to the witness that he was hurt. The side door from which the fatal shot was fired was on the west side and near the middle of the room. The other side door was on the same side, but further north. As soon as the shooting was done witness went home and went to bed. About 4 o'clock on the next morning the witness was awakened by his employee, and told that John Herndon wished to see him. Witness got up, and was requested by Herndon to go up to the Stock Yard saloon. Witness went to that saloon up Main street, and Herndon went to it up Elm street. Herndon arrived at the saloon before the witness did. The room in which the witness slept that night was over the Blue Front saloon.

Cross-examined, the witness stated that he had never had trouble with the deceased before the night of the shooting. Witness and deceased were quarreling about a steer when the latter was shot. Witness had told deceased that, if he accused him of stealing the

steer, he was a liar. Deceased was a heavily built, stout man, though not very tall. The chair used by deceased in striking the witness was a large, armed, bar-room chair. Witness then threw up his hand and caught the blow on his knuckles. Defendant was behind the witness, and fired the fatal shot just as witness pushed the deceased back, and the chair struck the floor. When shot, the deceased was in a partially stooping position. Witness made every available effort to keep out of the difficulty with the deceased, knowing him to be a dangerous man when in drink. Ike Hunnicutt, George Waller and John Hunter were at the saloon when the witness arrived there at 6 o'clock on the morning after the homicide. Witness denied that, on that morning, at the saloon, and in the presence of the parties named, he shot the deceased. They said so, but he did not. Witness went down the street from the saloon with George Miller on the morning after the shooting, but had no recollection of telling Miller that he shot the deceased. Witness was then drunk, and did not know what he may have said. Witness denied that he had ever said, in the presence of Nat Tumey or anybody else, that he shot the deceased. Witness testified on the *habeas corpus* trial, but could not now say whether or not he denied on that trial that he had ever claimed to have shot the deceased. Witness testified before the grand jury that he shot the deceased. After he was remanded to jail by the grand jury two of the grand jurors came to him, told him that they knew he did not do the killing, and if he would tell the truth before the grand jury he would be turned loose. As he was tired of jail, and had some pressing business matters awaiting his attention, witness consented, went back and testified before the grand jury that the defendant shot the deceased; which was true. Witness was sent to the penitentiary from Dallas county for giving a negro $5 for a steer. Witness saw no pardon from the Governor for that offense before he went before the grand jury, nor did he ever see it but the one time, on the *habeas corpus* trial. Deceased had no knife in his hand that night, that the witness saw.

Will Lanham, a cousin to the defendant, was the next witness for the State. He testified that he was at the Stock Yard saloon and took a drink with the defendant just before the shooting. The deceased was at the saloon at the time, and was quarreling with Polser about a steer which he said belonged to his brother and which Polser had killed. Polser said that deceased's brother was present when he skinned the steer and did not claim it, and deceased called Polser a liar. Polser and deceased afterwards took a drink together, but deceased soon recommenced the quarrel, and witness and Jim

Gray left them quarreling. Just as witness left he heard some one say: "Take your hand out of your pocket, Frate." When witness and Gray reached a point two or three hundred yards distant, they heard what they took to be a shot behind them. Gray asked: "What is that?" and witness replied: "It sounded like a pistol."

Cross-examined, the witness said that when he heard the shot he and Gray were on Elm street, east of the saloon, on the road leading direct to the defendant's home. Elm street ran parallel to Main street. He heard no one riding along Main street after the shooting; though had any one ridden along that street at that time at a rapid pace witness could easily have heard him. Witness did not see the defendant after he left the saloon, which was early in the night,— not later than 9 o'clock. Defendant rode his brother's bald-faced bay horse to town on that night, and his brother Ike rode a gray horse. Late on that night the witness saw Ike Hunnicutt at a dance to which he rode a gray horse. The dance was at a house on the direct road from the Stock Yard saloon to Chris Fisher's house. If defendant, on leaving the saloon, had gone to Fisher's over the route by the way of Main street, he would have traveled a much longer distance over a bad, muddy road.

On re-examination the witness said that the long route spoken of by him was over an unfrequented road. The distance could be shortened if a traveler could find means to cross a pasture which lay on that route. Witness did not know whether or not there were any gates to that pasture. The State closed.

John Herndon was the first witness for the defense. He testified that he was present when the shooting occurred, which was between 11 and 12 o'clock at night. Witness reached the saloon about sundown. The deceased was then at the saloon. Polser came in about dark, and defendant a few minutes later. Soon after Polser's arrival deceased commenced a row with him about a steer which, as he charged, belonged to his brother, had been stolen by defendant and Elam, and sold to Polser. Deceased left, and returned after some time and re-engaged in a quarrel with Polser, but the quarrel was suspended by Polser treating. Witness last saw the defendant in the saloon about 9, or between 9 and 10, o'clock. When the deceased came back and commenced the last and the fatal quarrel with Polser, Ike Hunnicutt was at the billiard table and George Waller was behind the counter, his head resting on the north end. Deceased asked Polser to step with him to the rear of the room. He, deceased, then had a knife in his hand, open. Polser said to him: "If you are not satisfied, you can go to h—ll." Deceased

then took up a heavy bar-room chair and struck Polser, staggering him against a door on the west side of the house. Polser, recovering, went towards the east side of the room, which brought his back directly towards the witness. At this moment the witness heard the report of a pistol, and saw the flash between Polser and the deceased. Because of their positions with reference to each other, witness could not see the pistol in Polser's hand. Polser fired the pistol just as the chair which deceased had used struck the floor, and just as deceased started towards him. Deceased still had the knife in his hand as he started forwards towards Polser. At the time the shot was fired Polser was facing south and deceased north. As soon as the shot was fired Polser stepped behind the counter and laid down something which witness did not see.

There was a narrow passage or alley-way in the rear of the west side of the saloon. At the extreme south end of this passage a door opens westward to the inside. It does not open entirely to the south wall, but strikes the west wall near the corner. Polser, at the time of the shooting, stood slightly to the east of where the deceased stood. A ball passing from the spot where Polser stood, directly through the spot where the deceased stood, would strike the door described. On the morning after the shooting, the witness's attention was called to a bullet hole in the door. It was through a thin, soft, white pine panel. The south wall was slightly punctured behind this hole. The ball, it seemed, merely broke the wall paper and indented the wall, without entering. On the next morning the witness saw a ball which was said to have been picked up under this hole, but he did not see it picked up. George Garrison, a proprietor of the saloon, was said to have found that ball, and had it in his possession. Witness also saw a knife picked up on the outside, in front of the door through which deceased passed after he was shot. The knife was found on the morning after the shooting. It was looked for, but not found, on the night before. Polser and deceased were both considerably under the influence of whisky when the shooting occurred.

Cross-examined, the witness said that he went to sleep, late that night, on the billiard table in the saloon in which the shooting took place. He stayed in town because he was seven or eight miles from home, and the road he would have had to travel, going home, was bad and muddy, and because he was told by Constable Miller that he must be present at the inquest on the morrow. Witness went to Polser's business place early on the next morning, and inquired for him. A boy in his employ was sent off for him. Witness then

went up the railroad and met him, and told him to go to the saloon. Thence witness went to the saloon by the way of Elm street. He did not know which road Polser traveled to the saloon, but he and Polser reached the saloon about the same time. Witness went after Polser partly because he had some curiosity to ascertain whether or not he had fled, and partly because Constable Miller told him to tell Polser, if he saw him, to be at the saloon early, and surrender. Witness told the said Miller, on the night of the killing, that he was in the room but did not see Polser fire the fatal shot, but that no one else could have fired the shot. Witness told him just what he has testified on this trial. Witness had made no agreement with any one with respect to his testimony in this case. He was under an indictment (preferred by the same grand jury which presented this indictment against the defendant) for perjury, for testifying before the coroner's inquest exactly as he had testified on this trial. Witness did not arrange with any one to impute this murder to Polser, under oath. He did not bring Polser to the saloon next day and try to secure his promise to assume the killing in order to protect the defendant. He did not, with George Waller and Ike Hunnicutt, at the saloon next day, try to persuade Polser to admit that he did the killing. Witness would not undertake now to say who killed the deceased, but it was his impression that Polser did it. The reason why witness refused to give an account of the homicide to the newspaper reporter, that night, was that he did not want to be mixed up in the matter. Witness was not related to the defendant, but his wife was defendant's cousin.

As to what occurred at and before the killing, Ike Hunnicutt, the brother of the defendant, testified substantially as did the witness Herndon, and, in addition, that he sat on the north end of the billiard table, opposite the side door, and saw Polser's pistol as he fired, and then saw Polser take the pistol behind the counter and lay it down. Witness went to the dance that night, riding his gray horse, and returned late, to be present next day at the coroner's inquest. He went to bed on the billiard table in the saloon, with John Herndon. When he woke up next morning, Herndon was gone, but soon returned. Polser arrived at the saloon nearly at the same time. Witness was present on that morning, and heard Polser tell Miller that he killed deceased. Witness saw a ball in the possession of George Garrison, said to have been picked up by him behind the door described by Herndon. He also saw the hole in the door, and saw Miller pick up the knife outside the door, on the next morning. A straight line drawn from where Polser stood when he fired,

to the hole in the door, would pass through the space occupied by the deceased at that time.

On cross examination, the witness stated that he testified to these same facts before the coroner's inquest, and for that reason the same grand jury which found this indictment indicted him for perjury.

William Triplett testified, for the defense, that he came from North Carolina to Texas, about ten years before this trial. He knew the witness John Minton in North Carolina, and lived and was reared in the neighborhood in which Minton then lived. He knew Minton's reputation for truth and veracity up to the time that witness left North Carolina. Minton was then nineteen years old. Witness and Minton were related by marriage. When Minton first came to Texas he lived in Rockwall county. He lived with witness then about three months, and for a month of this time witness knew his reputation for truth and veracity to be bad.

Cross-examined, the witness testified that he left North Carolina himself because of trouble. Witness could only remember to have heard Jim Mason, Jim Donnell and another person, whose name he could not remember, residents of Rockwall county, impugn Minton's reputation for truth and veracity.

Gus Triplett testified, for the defense, that he was related to the witness Minton, and knew his reputation for truth and veracity in North Carolina up to four years before this trial. It was bad.

Cross-examined, witness said that he was present as a witness under attachment. He had trouble in North Carolina before he left. The paternity of an illegitimate child was imputed to him. He was also sentenced to a term of three months' imprisonment for illicit distilling, and served two months and twelve days of the term, and was released.

Constable George Miller testified, for the defense, that he heard of the shooting and went to the saloon between 11 and 12 o'clock. A crowd had gathered when he arrived. He called John Herndon out of the saloon, and questioned him in regard to the matter. Herndon described the positions in the house of the various parties, and said that Polser shot the deceased in self-defense; that he did not see Polser fire the fatal shot, but that no one else could have fired it. Witness then went into the saloon and found George Waller and others, and from other persons whom he could not name he learned about the same facts he had gleaned from Herndon. Witness could not find or hear of Polser, but did not make a vigorous search, as the parties told him that Polser killed

the deceased in self-defense. He told Herndon to see Polser and tell him to be at the inquest next morning and surrender. Witness went to the saloon early next morning and found Polser there. Polser told witness that he killed deceased, and had to kill him in self-defense. Witness was told on the night before that deceased had a knife in his hand when Polser shot him, but that he had none when he got to his hotel, after he was shot. Witness looked, but found no knife on the night of the shooting. He found an open knife next morning in the yard in the rear of the saloon. He also noticed a bullet hole in the extreme south door. From appearances witness would judge that the bullet which struck the door came straight down the little passage, and struck the door while it was closed. According to witness's recollection the door was splintered a little on the side which would be out when closed.

Cross-examined, the witness said that the bullet hole in the door was first called to his attention on the morning after the homicide. He was told that no one but Ike Hunnicutt, Joe Polser, John Herndon and George Waller were in the room when the shooting occurred, and he took their words as to who fired the fatal shot. Deceased was past speaking when witness saw him that night.

Willis Fortune testified, for the defense, that he lived two or three hundred yards from the Stock Yard saloon. He heard the report of the fatal shot, and hurried to the saloon as soon as he could get into his clothes. He found Ike Hunnicutt, George Waller, John Herndon and Joe Polser at the saloon. He asked who was hurt. Some one of the party replied: "Frate Umphress is shot." Witness then asked who shot him, and the reply was that "Joe Polser is supposed to have shot him." Witness then asked how the shooting happened, and some one replied that the shooting was in self-defense. Witness then went to where deceased was. Witness was present at the *habeas corpus* trial, and thought, but was not certain, that he testified on that trial.

M. G. Tumey testified, for the defense, that he was in the office of Justice of the Peace Kendall, on the morning after the killing of the deceased, when Miller came in with Joe Polser. Witness remarked: "I see from the newspapers that our friend Hunnicutt is trying to break into the penitentiary. He got his man last night." Polser replied: "No, I'm the man that killed the d—d son-of-a-b—h. I had to do it."

George Miller, recalled for the defense, testified that he was familiar with Joe Polser's reputation for truth and veracity, and that it was bad. He heard Polser say on the morning after the homicide

that he killed the deceased. Polser was then sober. On the way from the saloon, witness heard him tell perhaps forty people that he had killed the deceased. He told witness and nearly every person they met that he had killed the d—d son-of-a-b—h. He heard Polser swear on the *habeas corpus* trial that he had never told any one that he killed the deceased until he told it before the grand jury. John Herndon's reputation for truth and veracity was good. Deceased was regarded generally as a quarrelsome, violent man, who would fight "at the dropping of a hat." Witness could not say that he was a dangerous man.

W. F. Frank testified, for the defense, that he reached the saloon near 6 o'clock on the morning after the homicide. Polser was there and said that he killed the deceased. Describing the premises, the witness said: " In the rear and on the west side of the saloon there is a hall about four feet wide and about twelve or fifteen feet long. This hall is made by cutting off two small rooms on the east side of the saloon. Each room has a door opening to the hall. The door at the south of this hall opens to the west, and goes back nearly to the south wall, catching against the west wall some five or six inches from the south wall. I saw, on the morning after the killing, where a ball had passed through this door about eighteen inches from the floor. The door was splintered a little on the rear side as it stood open. The panel through which the ball passed was very thin, and made of soft white pine. A person could see from the shape of the hole that it was made with a pointed pistol ball that had turned and struck the door on its side. The walls of the house were canvased and papered. There was a place in the south wall in the rear of this hole, as the door stood open, where the paper had been broken as if by a spent ball, and there was a slight indentation in the timber. I do not remember whether the canvasing was broken or not, but I know the ball did not penetrate the wall. I also saw a pistol ball which was said to have been picked up behind this door, but I don't know whether or not it was after this. I was hired to work in this saloon some. Shortly afterwards a dispute arose as to where the ball that killed Umphress was fired from,— whether from the side door or in the saloon west of and near the billiard table. I was with several parties who examined the walls, the billiard table, and the floor east of and opposite the side door, and no mark or ball could ever be found. I learned from all who were present the next morning where Polser stood and where Umphress stood at the time of the shooting. These points and the bullet hole in the door that I have spoken of were on a direct line with each other. I was

on the jury of inquest that sat upon the body of Umphress. Umphress's right hand was powder-burned. Polser said before the coroner's inquest that he did the killing, but the coroner's jury did not say so."

Several witnesses for the defense testified that the reputation of Joe Polser for truth and veracity was bad; that that of John Herndon was good, and that the deceased bore the reputation of an irritable, quarrelsome, fighting man.

The State introduced R. H. Stafford, in rebuttal. He testified that, in the summer of 1884, he and Joe Polser were partners in the butcher business. On the morning of June 17, 1884, John Herndon came to witness's shop and asked for Joe Polser. Witness told Herndon that he did not know where Polser was, but would send to his room for him. Witness accordingly dispatched one Kennedy, an employee, to Polser's room over the Blue Front saloon. A short time later Herndon left, going in that direction. Presently he and Polser came back to the shop on Elm street. They talked together awhile and left, Herndon going up Elm street, and Polser crossing a vacant lot towards Main street.

Joe Polser, recalled for the State, testified that Kennedy woke him early on the morning after the killing, and told him that Herndon wanted to see him. Witness joined Herndon and the two went separately to the Stock Yard saloon, the witness going up Main and Herndon up Elm street. John Herndon, Ike Hunnicutt and George Waller were at the saloon when witness arrived. The parties named said that something had to be done for the defendant,— that witness must take the killing on himself, and witness agreed to do it.

R. H. Wagner, for the State, testified as follows: "I was on the grand jury that found this bill of indictment. The grand jury, while investigating the case, went to the Stock Yard saloon. We saw the hole in the door in the south end of the saloon, and the puncture or bruised place in the wall behind the door. I don't remember whether the puncture was immediately behind the hole or not. I don't remember to have noticed whether it was higher or lower, or to the right or left of the hole. Some one drove a tack into the indentation in the wall, and we tied a string to the tack, put it through the bullet hole and drew the string back as nearly as we could in a straight line from the tack. We did this carefully, to ascertain the range of the ball. By getting the string straight as near as we could, it entered the north side door of the hall. This door was three or four feet from the partition wall which divided

the main room of the saloon from the side room. This hole was about eighteen inches from the floor."

J. T. Elliott testified, for the State, in rebuttal, as did the witness Wagner, and in addition, that the indentation in the wall was from two to three inches higher than the hole in the door.

The motion for new trial raised the questions discussed in the opinion.

*R. B. Seay,* for the appellant. There is no power vested in the Governor of Texas to pardon a convict for the purpose of restoring him to citizenship, after he has fully served out his sentence. (Citing Constitution of Texas, article 4, section 11.)

A pardon by the Governor which merely undertakes to restore the convict to citizenship does not restore him to competency as a witness. (*People* v. *Bowen,* 43 Cal., 439.)

A charter or proclamation of pardon, where the original is lost, must be proved by a certified copy under the great seal of the State, and cannot be proved by oral testimony. (*Cooper* v. *The State,* 7 Texas Ct. App., 199.)

Even if the charter of pardon were an instrument the contents of which could be proved by oral testimony, the loss must be fully and satisfactorily proven before secondary evidence is admissible. (1 Whart. Ev., secs. 129, 136, 141; 1 Greenl. Ev., secs. 509, 558; Whart. Cr. Ev., sec. 174.)

When there is a mistake as to description in an instrument of writing, it must be fully and satisfactorily proved that the maker of the instrument intended to refer to the subject-matter claimed, and no other.

A convict cannot testify to anything until his disabilities are removed, and this must be done by record proof. He cannot testify to facts which make him competent, but his competence must be proved before he can testify at all. (*Cooper* v. *The State, supra; Schell* v. *The State,* 2 Texas Ct. App., 30.)

Having failed to prove satisfactorily that the pardon applied to the conviction of 1878, the court asked the witness Polser himself if he had ever been in the penitentiary but once. He answered, over the objection of defendant, that he had never been in the penitentiary but once. This was error.

The court erred in not instructing the jury that if Joe Polser was an accomplice, accessory or principal, that they must acquit unless he was corroborated as required by law. (*Williams* v. *The State,* 42 Texas, 392; *Roach* v. *The State,* 4 Texas Ct. App., 46;

*Dubose* v. *The State*, 10 Texas Ct. App., 230; *Sitterlee* v. *The State*, 13 Texas Ct. App., 587; *Winn* v. *The State*, 15 Texas Ct. App., 169; *Howell* v. *The State*, 16 Texas Ct. App., 93; *Zollicoffer* v. *The State*, Id., 312.)

The court erred in admitting to proof the dying declarations of the deceased, because, to render such declarations competent, four requisites must be affirmatively and satisfactorily proved by the party offering them.

1st. That the deceased was conscious of approaching death, and had no hope of recovery.

2d. That such declarations were voluntarily made, and not through persuasion of any one.

3d. That they were not made in answer to any interrogatories calculated to lead deceased to make any particular statement.

4th. That he was of sane mind at the time. (Code Crim. Proc., art. 748; *Edmondson* v. *The State*, 41 Texas, 496; *People* v. *Hogden*, 55 Cal., 72; Whart. Cr. Ev., 281, 282, and note, 284; Id., 276; 1 Greenl. Ev., 162; 3 Crim. L. Mag., 433.)

Remarks made by the prosecuting attorney, illegal in their nature or outside of the record, which are in their nature calculated to influence the jury, and prejudice them against defendant, will necessitate the granting of a new trial to defendant. (*Hatch* v. *The State*, 8 Texas Ct. App., 416; *House* v. *The State*, 9 Texas Ct. App., 567; *Conn* v. *The State*, 11 Texas Ct. App., 391; *Sterling* v. *The State*, 15 Texas Ct. App., 256; *Crawford* v. *The State*, Id., 501.)

It is ground for a new trial that the jury, while considering upon a felony case, are allowed to read newspapers containing matter injurious to defendant, and containing statement of facts injurious to defendant which are not in proof. (*Walker and Black* v. *The State*, 37 Texas, 366; Whart. Cr. Pl. & Pr., secs. 829, 830; 1 Bish. Cr. Proc., sec. 999.)

A person when attacked need not resort to *other means* than killing to protect himself, where the assault by deceased indicates an intent to *murder, maim* or *inflict serious bodily injury*, but may kill at once and with the most effective means without such resort. The court, in this case, charged the jury that "homicide is permitted by law when inflicted for the purpose of preventing the offense of murder," under certain circumstances in said charge mentioned. And then charged that "homicide is justifiable also in the protection of the person against any other unlawful and violent attack besides that above mentioned, and in such case *all other means* must be resorted to for the prevention of the injury" except to retreat. De-

fendant claimed that the court in substance charged that the defend-
ant "is compelled to resort to all other means to prevent the injury
except retreating, even though the defendant at the time was in
danger of maiming or of *serious bodily injury.*" This exception was
taken at the time the charge was given. John Minton had testified
that defendant in his confession had said that deceased was attack-
ing him with a "long knife," and Joe Polser had testified that de-
ceased at the time of the killing was assaulting him, Polser, with a
large bar-room chair. These were the only two witnesses for the
State who testified to the facts and circumstances of the killing.
(*Branch* v. *The State,* 15 Texas Ct. App., 103; *Sterling* v. *The State,*
Id., 256; *Kendall* v. *The State,* 8 Texas Ct. App., 569; *Hill* v. *The
State,* 10 Texas Ct. App., 619.)

*J. H. Burts,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. At the trial of the case appellant
saved fifteen bills of exception to the rulings of the court, all of
which are incorporated in the record and each assigned for error.
We do not propose to discuss them *seriatim,* but will select only
those which present questions of a character likely to arise upon
another trial, if not now disposed of.

I. As to dying declarations. The witness Tooley testified that
when he reached and entered the room in which the wounded man
was, a short time after the shooting, the deceased said, "Oh my
God! Mr. Tooley, I am killed." "I then asked him who shot him?
He said, 'Jim Hunnicutt shot me.' I then asked him where he
was shot. He replied, 'I was inside of the saloon and Jim Hun-
nicutt was outside of it when he shot me.'"

It is insisted that these declarations were not made under circum-
stances which would admit them as dying declarations,— in a word
the objection was that it was not made to appear, as is required by
the statute: "1. That, at the time of making the declaration, the
party was conscious of approaching death, and believed there was
no hope of recovering. 2. That the declaration was voluntarily
made, and not through persuasion of any person. 3. That said
declaration was not made in answer to interrogatories calculated to
lead the deceased to make any particular statement. 4. That he
was of sane mind at the time of making the declaration." (Code
Crim. Proc., art. 748.)

The physician who attended the wounded and dying man does
not appear to have heard the remark made by deceased to Tooley,

and he says in his evidence, "He was dying, but I don't know whether he knew he was dying or not. He lived, after I got there, probably an hour or less."

Do the facts above stated show that the party was at the time "conscious of approaching death, and believed there was no hope of recovering?" We think so. No words could under such circumstances have been more conclusive of "the immediate apprehension of death" than his expression, "Oh my God! Mr. Tooley, I am killed." In *Edmondson* v. *The State*, 41 Texas, 496, the party had been saying she was going to die for three months; her wounds were mostly healed when she made the declaration, and "for aught that appeared she may have believed that she was not going to die for weeks or months to come." There was nothing said or done by the deceased, in this case, from the time of the shooting to his death, which indicated the slightest hope of recovery. (See Whart. Crim. Evid., §§ 276, 281, 282; *Lister* v. *The State*, 1 Texas Ct. App., 739; *Warner* v. *The State*, 9 Texas Ct. App., 619; *Burrell* v. *The State*, 18 Texas, 713.)

Mr. Greenleaf thus announces the rule with regard to such declarations: "It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were *made under a sense of impending death;* but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction; whether it be proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind." "But," continues the learned author, "where it appears that the deceased at the time of the declaration had any expectation or hope of recovery, however slight it may have been, and though death actually ensued an hour afterwards, the declaration is inadmissible. On the other hand, a belief that he will not recover is not itself sufficient unless there also be the prospect of almost immediate dissolution." (1 Greenl. Evid., 13th ed., § 158.)

We are of opinion that the declarations in this instance come within the strict letter of the rule thus stated. It is clear that the declaration was voluntary and not made through persuasion. Was it "made in answer to interrogatories calculated to lead the deceased to make any particular statement?" A part of the statement was in reply to interrogatories; but interrogatories are not prohibited,

nor will they invalidate the declaration unless they be of a character "calculated to lead the deceased to make the particular statement." (Code Crim. Proc., art. 748, subdiv. 3.) No such questions were asked deceased by the witness Tooley; his questions neither suggested the answer nor any particular statement. There was no error in admitting the dying declaration.

II. When the prosecuting witness Polser was placed upon the stand, defendant objected to his competency as a witness, upon the ground that he had been legally convicted of a felony, and had served a full term thereunder in the State penitentiary. This was admitted by the prosecution, but they claimed that the competency of the witness had been restored by a full pardon of the Governor of the State, granted for the express purpose of enabling him to testify in behalf of the State on the trial of this case.

A number of questions are raised in connection with this pardon. In the first place it is said it is beyond the executive authority and prerogative to pardon a convict who has served out his term of imprisonment and been discharged therefrom; and that such pardon cannot restore his competency as a witness.

Under the Constitution of the United States the President is endowed with "power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment." (Const. U. S., art. II, sec. II, subdiv. 1.) And our State Constitution confers upon the Governor, "In all criminal cases except treason and impeachment," the "power after conviction to grant reprieves, commutations of punishment, and pardons." (Const. Texas, art. IV, sec. 11.) Amongst those expressly declared incompetent to testify by our statute are "all persons who have been or may be convicted of felony in this State, or in any other jurisdiction, unless such conviction has been legally set aside, or unless the convict has been legally pardoned for the crime of which he was convicted," etc. (Code Crim. Proc., art. 730.)

The power of the executive of the State, under the State Constitution, to pardon offenses, is of the same general nature as that conferred upon the President of the United States by the Federal Constitution, except that the pardoning power of the President extends to the pardon of offenses before conviction, while the Governor can only pardon after conviction. In *The United States* v. *Jones*, 2 Wheeler's Crim. Cases, 451, which is the leading case in point upon the question we are considering, it was held "that a witness who has been convicted of felony, and suffered the judgment of the law by serving out the time for which he was sentenced in the State

prison, may any time afterwards be restored to competency by a pardon." In the ninth volume of the Opinions of the Attorneys-General of the United States, p. 478, the Hon. Jeremiah Black, Attorney-General, in a letter to Lewis Cass, Secretary of State, says: " A person convicted of an offense against the laws of the United States which disfranchises him as a citizen can be restored to all the rights which he had before conviction, by a free and full pardon from the President of the United States. Such pardon may be given after he has suffered the other penalties incident to his conviction as well as before."

Mr. Greenleaf says (speaking of the effect of a pardon in the removal of disability): " Though it were granted after the prisoner had suffered the entire punishment awarded against him, yet it has been held sufficient to restore the competency of the witness, though he would in such case be entitled to very little credit. The rule that a pardon restores the competency and completely rehabilitates the party is limited to cases where the disability is a consequence of the judgment, according to the principles of the common law." (1 Greenl. Ev. (13th ed.), §§ 377, 378.)

In the well considered case of *Wells* v. *Foley*, 15 Nev., 64 (*S. C.*, 37 Amer. Rep., 458), it is held that a pardon may be granted after the offense is fully expiated.

Mr. Bishop says: " By the general doctrine, when guilt is incurred, it can be remitted before judicial proceedings are undertaken, or during their pendency, or after their termination, or after the punishment has been fully endured. Yet by express words in the Constitutions of considerable numbers of our States " (and this is the case in Texas), "the pardoning power is forbidden to act before conviction." (1 Bish. Crim. Law, 7th ed., section 903.)

From these authorities we think it clear that the Governor had authority to issue the pardon, though the party had expiated his crime by serving a full term in the penitentiary.

But it is said that under the peculiar terms of our statute (Code Crim. Proc., art. 730, subdiv. 5), though a convict may be pardoned, he can only be " legally pardoned for the crime for which he has been convicted; " and that, whilst a pardon pending his imprisonment would both expiate the crime and restore his competency as a witness, and in fact restore all of his disabilities incident to the crime, yet the pardon simply of the crime for which he has been convicted, if granted after he has served his term of imprisonment, would only relieve him of the infamy of the crime *per se* charged against him, and would not restore his competency as a witness.

Mr. Bishop says, " A pardon is a remission of guilt." (1 Bish. Crim. Law, § 898.) But the general rule with regard to a full pardon seems to be that it " is to make the offender a new man; to acquit him of all corporal penalties and forfeitures annexed to the offense for which he obtains his pardon, and not so much to restore his former as to give him a new *credit and capacity.*" (4 Blackst. Com., 402. See, also, Greenleaf's Ev., § 377; *People* v. *Pease,* 3 Johns. Cases, 333; *Wood* v. *Fitzgerald,* 3 Oreg., 568; *In re Deming,* 10 Johns., 232; *State* v. *Baptiste,* 26 La. Ann., 136; *Ex parte Hunt,* 5 Eng. (Ark.), 284; *Hester* v. *The Commonwealth,* 85 Penn. St., 154; 2 Hawk. P. C., 547, and cases there cited; 1 Phill. Ev., 21; 1 Gilb. Ev., 259.)

And Mr. Justice Field, in *Osborn* v. *The United States,* speaks of a pardon as " releasing the offense, and obliterating it in legal contemplation." (91 U. S., 474.) Hawkins states the effect of a pardon thus: " I take it to be settled at this day," he observes, " that the pardon of a treason or felony, even after a conviction or attainder, does so far clear the party from the infamy of all other consequences of his crime that he may not only have an action for scandal in calling him traitor or felon, after the time of the pardon, but may also be a good witness notwithstanding the attainder or conviction; because the pardon makes him, as it were, a new man." (2 Hawkins's P. C., p. 547, § 48.)

And Mr. Bishop says: " A full pardon absolves the party from all the legal consequences of his crime and of his conviction, direct and collateral, including the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided. . . . Among the collateral consequences of an attainder or final sentence against the prisoner removed by pardon is the incapacity to be a witness. Yet only a full pardon has this effect." (1 Bish. Crim. Law, §§ 916, 917; *Edwards* v. *Commonwealth,* Va. Ct. App., 1884; 5 Crim. Law Mag., 308.)

Our conclusions from the authorities are that a full pardon after a prisoner has served his full term in the penitentiary has the same effect as would have had a pardon granted him during his term of imprisonment and before its completion, and that such pardon restores fully his competency as a witness.

But again it was objected to the validity of the pardon proposed to be proven, that it had never been delivered to or accepted by the grantee (the witness), the rule being, as insisted, that " a pardon, to be valid, must be delivered, and, like a deed of land, accepted by the grantee. Where there is no acceptance, it is void." (1 Bish. Crim. Law, § 907.)

Upon request of the county attorney the pardon had been sent to him by the Governor, and he had used it as a predicate upon which to base the right of the witness to testify on the *habeas corpus* proceedings previously had in this case. And under the authority of the pardon, the witness had testified at the *habeas corpus* trial. It had never been repudiated by the witness; on the contrary, he had exercised his right, under it, to testify at the *habeas corpus* trial. The correct rule is that as laid down in *Ex parte Powell*, 2 Ala. Law Journal, February 18, 1884, p. 408, wherein it was held: "1st. A pardon, in order to be complete, must, in contemplation of law, be delivered and accepted." 2d. "The principles applicable to the delivery of a pardon and an ordinary deed must be considered analogous, and in either case its delivery is complete when the grantor has parted with his entire control or dominion over the instrument, with the intention that it shall pass to the grantee or obligee, and the latter assents to it either by himself or agent; and the delivery to a stranger may be made effectual, in ordinary cases, by an appropriate expression of the intention with which the delivery is made, at the time of the delivery, although no formal words or acts are necessary." (Id.)

We are of opinion that the circumstances show a delivery by the Governor and such assent on the part of the witness as amounts to a delivery and acceptance in law.

But again, with reference to the pardon, it appears that the same had been lost or mislaid by the county attorney, who swore that he had made diligent search for the same and could not find it. A sufficient predicate was thus laid for the introduction of secondary evidence with relation to it. The county attorney proposed to prove the contents by parol. This was objected to, by defendant, upon the ground that a charter of pardon, where the original was lost, could only be proven by a certified copy, under the great seal of the State. This proposition is sustained by authorities as the law aforetime obtained, even in our own State. (1 Greenleaf Ev., sec. 377; *Schell* v. *The State*, 2 Texas Ct. App., 30; *Cooper* v. *The State*, 7 Texas Ct. App., 195.)

It is contended, however, that such cannot be the law now, because we have no statute requiring the registration of pardons in any of the offices of the State government. Whilst our statute does not, in express terms, require that the Secretary of State shall keep a "record book," it does expressly require that "he shall keep a fair register" of all the official acts of the Governor. (Rev. Stats., art. 720.) This, we think, is tantamount to a requirement that he should keep a record of all such official acts. And such being the

case, a certified copy or exemplification from his register or record would be the proper evidence of such lost documents, before resort could be had, if at all, to parol testimony. We think that this objection to proof by parol was well taken in the absence of any showing that an exemplification or certified copy of the same could not be obtained from the office of the Secretary of State.

There is another question relating to this pardon, which it becomes necessary that we should notice. It is agreed on all hands that the pardon, as granted by the Governor, misstated or stated incorrectly the date of the judgment wherein the witness had been convicted of the felony for which he was punished by imprisonment in the penitentiary. The rule is: " In the absence of fraud, a pardon will be good, though it states the date of the conviction incorrectly, if it was intended to cover and does cover the particular offense." (1 Bishop's Crim. Law, § 906.) It is not claimed that the pardon misrecited the offense, which, in effect, would have rendered it inoperative (1 Whart. Crim. Law, 5th ed., § 766, and note), but the date of the conviction only was incorrectly stated.

To support the pardon, the prosecution proved, by the records of the court, and by the prosecuting officer and the clerk, that, so far as they knew or could ascertain, the witness had been convicted and sentenced to the penitentiary in but one case, which was for theft of a steer,— that being the same offense mentioned in the executive pardon. The prosecution also called the witness Polser to the stand, and he was examined on his *voir dire* by the court over objection by defendant,— the objection being that, until the witness was rendered competent by a valid pardon, he was incompetent for any purpose. And the witness stated, in answer to the questions asked by the court, that he had never been in the penitentiary but once.

The court did not err in overruling the objection, because the statute in terms provides that "the court may, upon suggestion made, or of its own option, interrogate a person who is offered as a witness, for the purpose of ascertaining whether he is competent to testify," etc. (Code Crim. Proc., art. 732.)

III. The charge of the court is complained of, and assigned for error, in several particulars. It is claimed that it was fatal error of omission, in the charge, in that it did not instruct the jury with regard to the necessity of the corroboration of the witness Polser in case they should find said witness to be a *particeps criminis* in the homicide. Our statute which requires the corroboration of accomplice testimony (Code Crim. Proc., art. 741) has always been held to

include principals and accessories and all characters of *particeps criminis*. (Clark's Crim. Law of Texas, p. 552 and note 224.)

Whilst the record does not show conclusively that the witness Polser was either a principal, accomplice or accessory, yet it does show a state of facts which might tend strongly to establish that he was an accessory, and was endeavoring by his acts, declarations and conduct after the homicide to screen and shield the defendant, and, by assuming to be the guilty party himself, thereby enable the defendant to evade arrest or trial for the offense. (Penal Code, art. 86.) In view of this evidence, the court should have charged the law with regard to the necessity of corroboration. (*Howell* v. *The State*, 16 Texas Ct. App., 93; *Winn* v. *The State*, 15 Texas Ct. App., 169; *Powell* v. *The State*, 15 Texas Ct. App., 441; *Dunn* v. *The State*, 15 Texas Ct. App., 560; *Zoll coffer* v. *The State*, 16 Texas Ct. App., 312.)

An instruction upon this subject was a part of the law of the case, made so by the facts, and should have been given in charge by the court whether requested or not; and the failure to give it was a substantial and fatal error.

Again: there was testimony, offered in behalf of defendant, to prove an *alibi*. There is no charge of the court upon this subject. An exception was reserved by defendant to this omission of the charge. This error was also substantial and is fatal to the sufficiency of the charge. (*McAfee* v. *The State*, 17 Texas Ct. App., 131, and authorities cited; *Ninnon* v. *The State*, 17 Texas Ct. App., 650.)

Again, with regard to homicide permitted by law, the court erred in restricting it solely to the purpose of preventing the offense of murder. A person, when attacked, need not resort to other means than killing to protect himself where the assault by the deceased indicates an intent *either* to *murder, maim or inflict serious bodily injury*, but may kill at once, and with the most effective means, without resort to other means for the prevention of the injury. (*Kendall* v. *The State*, 8 Texas Ct. App., 569; *Ainsworth* v. *The State*, Id., 532; *Branch* v. *The State*, 15 Texas Ct. App., 96; *Hill* v. *The State*, 10 Texas Ct. App., 618; *Sterling* v. *The State*, 15 Texas Ct. App., 249.)

There are other objections to the charge, but the ones we have noticed are the most material. The case was not one of wholly circumstantial evidence, and the court was not bound to charge the law with regard to that character of testimony.

Certain remarks of the county attorney were excepted to. Vituperation of parties and witnesses, when unwarranted by the evidence,

is a practice too frequently indulged in by counsel, and one which should be promptly suppressed by the trial courts, especially in cases involving life or liberty. And it is as equally reprehensible for counsel to go outside the record to argue and discuss facts to the jury not in evidence and injurious to the defendants. (*Sterling* v. *The State*, 15 Texas Ct. App., 249; *Crawford* v. *The State*, Id., 501, and authorities cited.)

It is claimed as error that the jury, while trying the case, were permitted to read the Dallas Herald newspaper, which paper purported to give the proceedings had on the trial of the case, and which, it is averred, contained excluded testimony, and testimony incorrectly stated. We have before us in the record, incorporated in a bill of exceptions, the objectionable portions of the newspaper complained of. In *Walker and Black* v. *The State*, 37 Texas, 367, it was held that "allowing jurors in a criminal case to have access to newspapers containing imperfect or incorrect accounts of the trial will vitiate their verdict." See, also, Wharton's Crim. Plead. & Pro., 829, 830.) Our statute expressly prohibits any person conversing with a juror after he has been impaneled (Code Crim. Proc., art. 690), and even the officer in charge is not permitted to converse with them about the case, nor to converse about it with any one else in the presence of any one of them. (Code Crim. Proc., art. 692.)

The whole object and purpose of our law is to give a party accused of crime a fair and impartial trial. To secure this, every provision seems to have for its object the inviolability of the jury from extraneous and improper influences. They should decide the case alone from the evidence allowed by the court and given by the witnesses in person. To allow them to read newspaper reports of a case they are trying, when such reports are, or may be, incorrect, might operate the same injurious consequences as though they were permitted to talk with outside parties directly about the case. Such practices should not be tolerated.

For the errors we have pointed out and discussed, the judgment of the court below is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered June 17, 1885.]